UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CIVIL ACTION NO. 3:06-CV-00043 KKC

MARK NICKOLAS,                                                                 PLAINTIFF,

vs.                                  **OPINION AND ORDER**

GOVERNOR ERNIE FLETCHER, et al.,                                  DEFENDANTS.

* * * * * * * *

This matter is before the Court on Defendants' Motion to Dismiss [Rec. No. 13] and

Plaintiff's Second Motion for Preliminary Injunction [Rec. No. 16].

**I.      BACKGROUND**

The Plaintiff, Mark Nickolas ("Nickolas"), filed suit for injunctive and declaratory relief

pursuant to 42 U.S.C. §1983 against Defendants, Governor Ernie Fletcher, Secretary John Farris, and

Secretary Robbie Rudolph in their official capacities ("the State"), challenging the State's decision

to prohibit state employees from accessing websites classified as "blogs" from state-owned

computers.  Nickolas is a "blogger" whose website focuses on Kentucky politics and is critical of

the Fletcher administration. As a result of the disputed state policy, state employees can no longer

access Nickolas's website and other websites from state-owned computers.  Nickolas alleges that

the State's policy infringes upon his rights under both the First Amendment and the Equal Protection

Clause of the United States Constitution.

The State allows employees to use the Internet for work-related purposes and for limited

personal use so long as it does not interfere with their official duties. Following a study conducted

by a state committee which revealed that state employees' use of the Internet at work decreased employee efficiency, the State purchased Internet filtering software from a company called Webwasher. Webwasher sorts websites into specific categories and allows the State to prohibit access to certain categories of websites on state computers. The State can also override Webwasher's categorizations and manually prohibit access or grant access to a particular website by adding it to a "blacklist" of prohibited cites or a "whitelist" of permitted cites regardless of how Webwasher categorizes the site.

Prior to June 20, 2006, the State chose several Webwasher categories to be prohibited on state computers. Included were sites related to pornography and chat rooms. On or about June 20, 2006, the day Nickolas was quoted in a New York Times article critical of the Fletcher administration, the State prohibited access to several other Webwasher website categories including entertainment/motion picture, auctions/classified ads, humor/comics, newsgroups/blogs, and malicious websites.

The State alleges that the decision to prohibit access to these categories was made after discovering that employees were spending a significant amount of time on sites in these categories. The Plaintiff argues that the State's policy is not reasonable or viewpoint neutral.

A hearing on this matter was held on January 12, 2007. The Court took the matter under advisement and is now prepared to issue a decision in the matter.

## II.     STANDARDS

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "the factual allegations in the complaint must be regarded as true. The claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." *Scheid v. Fanny Farms Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quoting *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983)).

When deciding whether to issue a preliminary injunction, a district court should balance: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury if the injunction is not issued; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005), *cert. denied*, 126 S.Ct. 361 (2005). In First Amendment cases, the first factor will often be determinative. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

### III.    ANALYSIS

### A. JURISDICTIONAL ISSUES

The State asserts that Nickolas lacks standing because he does not have an injury in fact. Article III of the U.S. Constitution provides that the subject matter of federal courts is limited to "Cases" and "Controversies." U.S. Const. Art. III, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005). It is "long-settled. . . that standing cannot be inferred argumentatively from averments in the pleadings" but, instead, "must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)(quotations and citation omitted).

A federal court presumes that it lacks jurisdiction "unless the contrary affirmatively appears in the record." *Renne v. Geary*, 501 U.S. 312,316 (1991)(citation omitted).   The party seeking federal jurisdiction bears the burden of proving each element of standing. *FW/PBS*, 493 U.S. at 231. The Plaintiff must establish both "constitutional" and "prudential" standing. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

The purpose of this inquiry is to determine whether the parties have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72 (1978).

The State relies on *Loving v. Boren*, 133 F.3d 771 (10th Cir. 1998) to argue that Nickolas lacks standing to bring this action. In *Loving*, a university professor alleged that the university violated his First Amendment rights when it prohibited access to news groups via the university news server. The university's policy conditioned access to the full service news server on the basis of age and academic purpose. The court held that the professor lacked standing to assert his First

Amendment claim because the "[p]laintiff simply presented no evidence that he ever attempted to access news groups through the full service news server and was denied access because his purpose was something other than academic or educational, or that he intended to attempt access." *Loving*, 133 F.3d at 773. "He did not establish that he was injured by defendant's actions, let alone that the injury affected him in a personal and individual manner." *Id*.

Unlike the plaintiff in *Loving*, Nickolas alleges that he has asserted an injury in fact because the State has burdened the distribution of his website.  In support of his argument, Nickolas cites numerous cases holding that the distribution of pamphlets and other materials are protected by the First Amendment. *See Lovell v. City of Griffin,* 303 U.S. 444 (1938)("Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.").

These cases are not entirely applicable to this case. By restricting access to a website, the State has not actually affected the "distribution" of the information contained on the website at all. The information is still being disseminated on the website for anyone who is able to access it. Instead, by restricting access to a website during work hours, the State actually decreases the hours during which the information contained on the website may be read by its employees on its business equipment.  Nevertheless, a decrease in readership constitutes a First Amendment injury. *See Meyer v. Grant*, 486 U.S. 414, 422-23 (1988) ("The refusal to permit appellees to pay petition circulators restricts political expression" by "limit[ing] the number of voices who will convey appellees' message and the hours they can speak and, therefore, *limits the size of the audience they can reach*.").

Nickolas asserts that, prior to implementation of the State's policy, five percent of his

5

audience during the workday were on state-owned computers.  Nickolas may not have actually lost any readers because these state workers may well access his blog before or after work. Nevertheless, Nickolas asserts that he lost readers during the workday as a result of the State's policy. The Court finds this is a sufficient injury-in-fact to confer standing on a First Amendment claim.

The Defendants also argue that Nickolas fails to state a claim upon which relief can be granted. [Rec. No. 13]. In determining whether to dismiss a claim for failure to state a claim, "the factual allegations in the complaint must be regarded as true.  The claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheid v. Fanny Farms Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (*quoting Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983)). Nickolas's Complaint alleges that the State prohibits employees from accessing his website and others because of the viewpoint expressed on the prohibited websites. Taking Nickolas's factual allegations as true as it must on a Motion to Dismiss, the Court finds that Nickolas has stated valid First Amendment and Equal Protection claims.

Accordingly, the Defendants' Motion to Dismiss [Rec. No. 13] will be DENIED.

**B.      LIKELIHOOD OF SUCCESS ON THE MERITS**

**(1)      The Appropriate Constitutional Standard**

Nickolas alleges that the State's decision to prohibit access to his website on state computers infringes upon his rights under both the First Amendment and the Equal Protection Clause of the United States Constitution. (Rec. No. 1, Complaint ¶ 3). In analyzing government restrictions on speech on government property, the Supreme Court has stated the following:

Nothing in the Constitution requires the Government freely to grant access to all who

wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. Recognizing that the Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated, the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.

*Cornelius v. NAACP Legal Def. and Educ. Fund,*  473 U.S. 788 (1985).

The analysis has traditionally been applied to tangible government property, however, the analysis has also been applied in the situation where the government is limiting the use of its website. *See Putnam Pit, Inc. v. City of Cookeville, Tenn.*, 221 F.3d 834 (6th Cir. 2000).

The Plaintiff contends, however, that the forum analysis does not apply in this case and asserts that the standard in *Pickering v. Board of Education*, 391 U.S. 563 (1968) applies in this case. [Rec. No. 16, pgs 20-25] The *Pickering* analysis is a form of intermediate scrutiny that balances the government's interests, as an employer, against its employee's First Amendment rights. *Montgomery v. Carr*, 101 F.3d 1117, 1129 (6th Cir. 1996). In the Sixth Circuit, the *Pickering* analysis is applied to cases in which a public employee is claiming a violation of his or her First Amendment rights. Those rights are then balanced against the interests of the employer in promoting the efficiency of the workplace. *Anderson v. Evans*, 660 F.2d 153, 157 (6th Cir. 1981).

In this case, Plaintiff is not a public employee.  Accordingly, the *Pickering* analysis is not applicable.  Rather, the Plaintiff complains that the government has restricted access to his website on government property.  Thus, the forum analysis is the most logical and appropriate analysis to employ in this case.

7

(2)      **Public Forum vs. Non-Public Forum**

"This Court distinguishes three kinds of fora: 1) traditional public forum; 2) designated public forum; and 3) nonpublic forum." *Putnam Pit, Inc.*, 221 F.3d at 842. "Traditional public fora, such as streets, sidewalks, and parks, are places which by long tradition or by government fiat have been devoted to assembly and debate. In these areas, the state regulation must withstand strict scrutiny." *Id*. at 842-843 (citations and internal quotation marks omitted). A public forum, by definition, must be "open for expressive activity regardless of the government's intent"and allows for "open communication or the free exchange of ideas between members of the public." *Id*.

In this case, state employees are allowed access to the Internet via state computers during work hours. The State, however, has presented evidence that employees are permitted to use the Internet at work only for limited personal use and to assist them in carrying out their duties. [Rec. No. 13, Motion to Dismiss, Exhibit 1, Internet and Electronic Mail Acceptable Use Policy].  The use of the Internet on state computers is, therefore, not for "open communication or the free exchange of ideas between members of the public." Thus, the Internet on state computers it is not a traditional public forum. *Id*.

"In a designated public forum, the government intentionally open[s] a nontraditional public forum for public discourse. In such fora, the same standards apply as to traditional public fora...." *Putnam Pit, Inc.*, 221 F.3d at 843 (citations and internal quotation marks omitted). The Sixth Circuit uses a two-step analysis to determine whether a forum is a designated public forum or a nonpublic forum:

> First, we look to whether the government has made the property generally available to an entire class of speakers or whether individual members of that class must obtain permission in order to access the property. Second, we look to whether the exclusion

8

of certain expressive conduct is properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose. *Id*. at 843-844.

In *Putnam Pit, Inc.*, a publisher of an internet page, which was critical of the city government, sued the city alleging that refusal to establish a hypertext link to his website from the city's home page violated his First Amendment rights. 221 F.3d at 841. The court held that the city created a nonpublic forum by allowing hypertext links from its website. *Id*. The decision as to whether to add links to the website was made by the computer operations manager and he simply added links as they were requested. When plaintiff asked that his website be added as a hyperlink, his request was given somewhat different treatment and then denied. The city changed its hyperlink policy several times after plaintiff's request, reviewing requests on a case-by-case basis. The court held that under the first step of the analysis the website was a nonpublic forum because the city "has not provided open access to links to the city's site, whereby anyone could set up their own link from the city's site to an outside Web site without going through the city on a one-by-one basis." *Id* at 844.

Here, the State prohibited access to numerous websites, including those sites containing pornography and chat rooms. [Complaint at ¶ 23]. Thus, the State has not provided open access to any website but has limited access at its discretion. Therefore, under the first step of the analysis, the Internet on state computers is not a designated public forum.

Under the second step of the analysis, the *Putnam* court stated that "both the city's stated purpose and the nature of the forum are relevant to this determination." 221 F.3d at 844. In that case, the city stated that the purpose of the city's website was to publish information about the benefits and opportunities within the community. *Id*. The court held that the website was a nonpublic forum under the second step of the analysis as well because the site "primarily serves to convey information

9

to the reader" and "[t]his structure is consistent with the city's stated goals for the Web site, and is a further indication that the forum in question should not be considered a designated public forum." *Id*. at 844.

The State claims that the purpose of providing the Internet to state employees is to conduct state business. [Hearing Transcript, pg. 23]. Limiting access to certain websites as necessary for state business is consistent with this stated purpose. Thus, the Internet on state computers is not a designated public forum. Accordingly, in determining whether the State's policy is unconstitutional, the Court will analyze the Internet on state-owned computers as a nonpublic forum.

### (3)    Reasonable and Viewpoint Neutral

In regulating a nonpublic forum, the State's policy must be reasonable in light of the State's interest and viewpoint neutral. *Putnam Pit, Inc.*, 221 F.3d at 845. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Putnam Pit, Inc.*, 221 F.3d at 845 *quoting Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.

"Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas. The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *Putnam Pit, Inc.*, 221 F.3d at 845.

Therefore, although Nickolas has no entitlement to have his website accessed by state

10

employees during work hours, he may not be denied access based solely on the views that he expresses, without regard for the purpose and structure of the forum. *Id*.

In *Putnam Pit, Inc.*, the city stated that the purpose of the policy to limit hyperlinks on the city web page was to establish parameters in order to maintain the site's purpose, which was to provide information about the city. 221 F.3d at 845. Even though the Sixth Circuit accepted that the city's purpose was reasonable, it remanded the case to determine whether the decision to exclude the plaintiff's website was viewpoint based:

> The lack of established city policy in this area of developing technology is not fatal to the city's attempt to structure its Web site. In addition, Davidian has numerous alternative means of communicating his information; The Putnam Pit Web site has operated throughout this litigation, and although it is not linked to Cookeville's site, it can be accessed through a variety of other means. Nevertheless, the requirement that Web sites eligible to be linked to the city's site promote the city's tourism, industry, and economic welfare gives broad discretion to city officials, raising the possibility of discriminatory application of the policy based on viewpoint.

221 F.3d at 845-846.

Nickolas argues that the State arbitrarily distinguishes blogs from other websites, such as mainstream news websites, without any reasonable explanation. [Hearing Transcript, pg. 3].  The State alleges that its purpose in allowing access to the Internet is to conduct state business. The State does allow incidental personal use of the Internet for employees but only if it does not interfere with State business. [Hearing Transcript, pg. 20].

Nickolas argues that the State's policy is not reasonable in light of the purpose served by the forum. He argues that if the State is concerned about employee efficiency and limiting Internet usage to business-related purposes, then, it should not have a policy permitting any incidental personal use [Hearing Transcript, pg. 37].  Nickolas argues that state employees access mainstream news websites

11

much more often than blogs, thus, employee efficiency is not a reasonable basis for distinguishing between the two types of websites. [Hearing Transcript, pg. 6].

"The Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. "The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Id*. at 809. "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Id*. at 809. The Court must "engage in an independent determination of whether the government's rules and its application of its rules are reasonably related to the government's policy objectives." *United Food & Commercial Workers Union, Local 1099 v. S.W. Ohio Reg'l Transit Auth*., 163 F.3d 341, 358 (6th Cir. 1998). "Absent special circumstances, the state must prove the links in its chain of reasoning, for example, that its rules and its application of the rules in fact serve a legitimate interest of the state." *Id*. at 357.

The State submits the affidavit of Mark Rutledge, Deputy Commissioner of the Commonwealth Office of Technology, to explain why it prohibits state employees from accessing blogs during the workday. Rutledge states that Webwasher, a third-party vender, actually categorizes the websites and the State simply chooses which categories to prohibit employees from accessing on state-owned computers. [Rec. No. 32 , Affidavit of Mark Rutledge, pg. 5]. The State claims that in June 2006, it received verbal complaints from supervisors about employees spending excessive amounts of time on blogs during work hours. *Id*. In response to the verbal complaints, the State ran reports on Webwasher to identify the categories of websites that were frequently visited by state

12

employees. *Id.* The reports revealed that employees were frequently visiting the following categories: entertainment/motion picture, auctions/classified ads, humor/comics and newsgroups/blogs. *Id.* at 6. The State claims that as a result of the reports, it updated its Internet policy and prohibited access to these categories of websites. *Id.*

Nickolas argues that employees access mainstream news sites more than blogs. However, in his affidavit, Rutledge states that employees need those mainstream news websites in order to conduct State business. [Rec. No. 23, Exhibit A, Affidavit of Mark Rutledge, pg. 7; *See also* Hearing Transcript, pg. 23-24]. The State claims that Nickolas has failed to articulate a business purpose for allowing access to his blog. [Hearing Transcript, pg. 23-24].[1]

Through the affidavit of Rutledge, the State has offered evidence that the purpose of providing Internet access to state employees is to conduct state business. The State has submitted a study conducted by the Program Review and Investigations Committee to show that employees' Internet use during work hours decreases employee efficiency. [Rec. No. 23, Exhibit Attachments to Exhibit A, Program Review and Investigations Committee Report, pg. 9]. The State has also offered evidence that, as a result, it has implemented a policy which attempts to prohibit access to websites that have no business purpose. [Rec. No. 23, Exhibit A, Affidavit of Mark Rutledge, pg. 6]. This policy is reasonable and consistent with the purpose of the Internet on state-owned computers, which is to conduct state business.

Nickolas argues that the State engaged in viewpoint discrimination when it chose to prohibit access to blogs but not main stream news websites. [Hearing Transcript, pg. 12]. He argues that the

---

[1] At the Hearing, in response to the Court's question of whether or not anyone had asked that Nickolas's blog be added back to allow employee access for business purposes, the State responded in the negative. [Hearing Transcript, pg. 29].

two types of websites contain nearly the same type of information except that blogs tend to be more hostile or plain-spoken in criticizing the government. [Hearing Transcript, pg. 8]. Nickolas further claims that the State has too much discretion to determine which websites will be restricted because even though a third-party vender, Webwasher, categorizes websites, the State has the ability to override Webwasher and add a site to either the whitelist or the blacklist. [Hearing Transcript, pg. 11-12]. Additionally, he argues that the State allows access to certain blogs but not others and that the ban on blogs may be specifically targeted at his website. [Rec. No. 15, pg. 4; Rec. No. 16, pg. 36].

In support of his argument, Nickolas claims that the normal procedures regarding a change in the computer systems were not followed when the State adopted its new Internet policy. [Rec. No. 16, pg. 9 and Exhibit 16]. Furthermore, as evidence that the State's policy specifically targeted him, Nickolas states that the ban on blogs was implemented the same day that he was quoted in the New York Times article criticizing the Governor and his administration. [Rec. No. 16, pg. 10 and Exhibit 3].

Nickolas claims that the policy itself is evidence of an invidious motive because main stream news websites and blogs are virtually the same and mainstream news sites are accessed by state employees much more frequently than blogs, thus, the two types of websites should not be treated differently.[2]   Nickolas claims that the State has no evidence that blogs caused any particular disruption in the workplace. He argues that the State distinguishes among particular blogs based on

_____

[2] In support of the proposition that mainstream news sites and blogs should not be treated differently, Nickolas cites to several cases, such as *Pitt News v. Pappert*, 379 F.3d 96 (3rd Cir. 2004) and *Leathers v. Medlock*, 499 U.S. 439 (1991), whose facts and analysis are very different from the present case before the Court. [Rec. No. 16, pgs. 15-17]. Nickolas appears to assert that his freedom of press rights have been violated because the State banned blogs yet did not ban mainstream news websites.

the viewpoint expressed. In support of this argument, Nickolas alleges that in a television interview, Governor Fletcher's Chief of Staff stated that a process was in place that would allow employees to access blogs that are purely policy-oriented. [Rec. No. 16, pg. 7].

The State claims that they are able to pick broad categories of websites to eliminate but that it is not an exact science and some websites that should have been prohibited and some that should be accessed slip through the system. [Hearing Transcript, pg. 27-28]. Thus, the State argues that it must have some way to add or subtract websites from a particular category. *Id*.  At the hearing on this matter, the State explained that initially, prohibited websites were manually added at virtually any employee's request.  The State conceded that this resulted in granting access to some websites for which there was no legitimate purpose. Counsel for the state asserted that more recently, however, the State has implemented a system whereby an agency head must request that employees be granted access to a particular website and that access will be granted only if the agency head determines that there is a legitimate business purpose for accessing a particular website. [*Id*. at 29; Rec. No. 23, Affidavit of Mark Rutledge, pg. 6]. [3]

"Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806.  "Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress

---

[3] At the hearing, however, the state did not disclose whether access to the site would be restored statewide or only to those agencies or workers in need of the site.

the point of view he espouses on an otherwise includible subject." *Id.* (citations omitted).

As discussed previously, the State has presented evidence as to why blogs were excluded as a category and not mainstream news websites and the reasons as to why some discretion regarding the adding and subtracting of websites is required. [Rec. No. 23, Exhibit A, Affidavit of Mark Rutledge, pgs. 5-7; *See also* Hearing Transcript, pg. 27-28]. The State has presented evidence to contradict Nickolas's assertions that it engaged in viewpoint discrimination. The State provided evidence that the discretion as to whether to override Webwasher is limited to a process by which an agency head must request the override and provide an explanation as to the business purpose of the website. [Rec. No. 23, Exhibit A, Affidavit of Mark Rutledge, pgs. 6-7 and Exhibit Attachments]. This is not viewpoint-based discrimination.  Thus, at this point in the litigation, it does not appear that Nickolas's First Amendment claim has a strong likelihood of success on the merits. [4]

**(4)     Equal Protection Claim**

Nickolas claims that he suffered an injury under the Equal Protection Clause because the state singled him out for special treatment based on his viewpoint. [Rec. No. 15, pg. 7]. At the hearing, Nickolas states that the Court need not engage in a separate analysis for his Equal Protection Claim because that claim is based on the First Amendment. [Hearing Transcript, pg. 10]. Nickolas cites *Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972) as support for this proposition.

---

[4] Nickolas passively mentions that his First Amendment right to petition the government may also have been violated by the Defendants. [Rec. No. 15, pg. 6]. Nickolas appears to make this argument in furtherance of his standing argument, however, to the extent Nickolas argues that this claim is separate and distinct, the Court will analyze it briefly. Nickolas claims that a major purpose of his Website is to influence state policy, thus, his core audience consists of state employees. At the hearing, however, Nickolas admitted that he has no evidence to show that he is reaching policy makers in state government as opposed to state employees who are employed to conduct the daily business of state government. [Hearing Transcript, pg. 7-8]. Thus, Nickolas's claim that his First Amendment right to petition the government has been violated is not likely to succeed on the merits.

In *Mosley*, the plaintiff challenged a city ordinance that prohibited picketing on public streets near school buildings. 408 U.S. 92. The ordinance prohibited all picketing except peaceful picketing involving a labor dispute. *Id.* The court analyzed the case under the Equal Protection Clause and the First Amendment and found that the public street was a public forum in which content-based restrictions must be narrowly tailored to serve a compelling state interest. *Id.*; *See also Bronx Household of Faith v. Community School Dist. No. 10*, 127 F.3d 207 (2nd Cir. 1997).

The Court has determined that Nickolas has not shown that he is likely to succeed on the merits of his First Amendment claim. Thus, since Nickolas's Equal Protection Claim is based on his First Amendment Claim and the Court need not engage in a separate analysis, Nickolas likewise does not have a strong likelihood of success on his Equal Protection claim.

## C. OTHER FACTORS

The Court must balance four factors when deciding whether to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury if the injunction is not issued; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Cranmer*, 399 F.3d at 760.

"When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor. With regard to the factor of irreparable injury, for example, it is well-settled that loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Reno*, 154 F.3d at 288 (citations and internal quotation marks omitted). "Likewise, the determination of where the public interest lies also is dependent on a determination of the likelihood of success on

17

the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." *Id*. (citations and internal quotation marks omitted). Additionally, the State would be harmed if a constitutional policy were enjoined but that determination also requires a review of the merits of the claim. *Id*.

"Accordingly, because the questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is, and will be in this case, whether the statute at issue is likely to be found constitutional." *Reno*, 154 F.3d at 288. The Court has determined that Nickolas's claims do not have a strong likelihood of success on the merits. Thus, Nickolas's Motion for Preliminary Injunction [Rec. No. 16] will be DENIED.

### IV. CONCLUSION.

Accordingly, it is **ORDERED** as follows:

(1)     Defendants' Motion to Dismiss (Rec. No. 13) is **DENIED**;

(2)     Plaintiff's Second Motion for Preliminary Injunction (Rec. No. 16) is **DENIED**;

(3)     this matter is referred to Magistrate Judge J. Gregory Wehrman for purposes of conducting a Rule 26 Conference; managing discovery and resolving all discovery disputes; conducting a settlement conference as he deems appropriate; and, resolving all non-dispositive motions.

This the 30th day of March, 2007.



**Signed By:**

*__Karen K. Caldwell__*

**United States District Judge**

18